HELEN SELVIG HENK, ADMINISTRATRIX OF ESTATE OF FLORIAN A. HENK, v. COLUMBUS AUTO SUPPLY, INC., AND OTHERS.
COLUMBUS AUTO SUPPLY, INC., AND OTHERS, APPELLANTS.
UNITED STATES OF AMERICA, APPELLANT.

101 N. W. (2d) 415.

February 5, 1960—Nos. 37,742, 37,743.

*Mark J. McCabe*, pro se and for other defendant appellants.

*Charles K. Rice*, Assistant Attorney General; *Lee A. Jackson, I. Henry Kutz*, and *George F. Lynch*, Attorneys, Department of Justice; *Fallon Kelly*, United States Attorney; and *Clifford Janes, William S. Fallon*, and *Frank W. Rogers, Jr.*, Assistant United States Attorneys, for the United States.

MAGNEY, COMMISSIONER.

On August 25, 1951, Mark J. McCabe was appointed operating receiver of Columbus Auto Supply, Inc. On October 31, 1952, the United States of America filed a claim in the receivership in the sum of $7,615.08 for income taxes against the corporation. A supplemental claim of $115,891.59 was filed later. After a trial in which certain interrogatories were submitted to a jury, judgment was entered against the corporation taxpayer, and it appeals therefrom. The court, in its findings, denied the government's claims for excess profits taxes for the years 1944, 1945, and 1946 on the ground that the statute of limitations had run against them. Because of these adverse findings, the government also appeals from the judgment.

In 1937, Joseph Henk, as sole proprietor, opened a store in Minne-

apolis for the sale of automotive supplies. His brother Florian came to work for him. Since 1918 Joseph had been engaged in the same kind of business either as sole proprietor or as a partner. In 1940, Joseph, Florian, and one F. N. Fry formed a corporation under the name of Continental Auto Supply, Inc. Later the name was changed to Columbus Auto Supply, Inc. Two thousand shares of stock were issued, 1,000 to Fry, 999 to Joseph, and one to Florian. In 1941, Fry withdrew, and the corporation purchased his shares. Florian's one share of stock was turned over to Joseph in 1948. In 1937, when Florian came to work for Joseph, the brothers agreed to share the profits of the business equally. This arrangement continued after the corporation took over. What each brother received under this agreement was called a bonus. It was the regular practice to declare a bonus at the close of each fiscal year, which ended on April 30. All but about $500 of the earnings of the corporation was divided each year in that manner until Jerome, a son of Joseph, returned from the service and went to work for the corporation. Commencing April 30, 1946, the profits were split three ways, all sharing equally. The share each received was called a bonus. Joseph drew $25 a week; Florian, $40.20; and Jerome started out at about $40 per week. Florian died December 27, 1949. After his death the drawings of Joseph and Jerome increased.

For the fiscal year ending April 30, 1944, Joseph and Florian each received $9,000 as bonus. That was the first year that the corporation paid or was able to pay a bonus. In 1945, each received $15,000; in 1946, each received $18,000; in 1947, Joseph, Florian, and Jerome each received $11,000; in 1948, Joseph received $7,606.36; Florian, $6,815.98; and Jerome, $5,977.63. In 1949, Joseph received $6,285.86 and Jerome received $5,714.14. In 1950, Joseph and Jerome each received $4,300 as bonus and drew $4,145.76; in 1951, Joseph and Jerome each received a bonus of $1,462.68 and drew $10,100 and $6,463.11, respectively. Every year the corporation listed the bonuses on its Federal income tax return and claimed them as deductions for personal services actually rendered.

After the officers had declared the bonuses for themselves, checks were issued by the corporation in payment. The checks covered the

amount of the bonus in each case, less the withholding and social security taxes. They were accepted as salary or compensation. It was intended that the checks eventually would be cashed. Very few of them actually were cashed. Some were exchanged for notes of the corporation. The checks were not cashed because the cash was needed in the operation of the business. The bonus was the only compensation given to the officers in payment of their services aside from the small amounts they received as drawings. It is clear from the evidence that, when the drawing account was fixed at so much per week, it was anticipated that additional compensation would be received. Joseph, Florian, and Jerome paid their own individual income taxes on the drawings and the bonuses. They disclosed in their individual returns that the bonuses were compensation for their services to the corporation. No fault has been found with their individual income tax returns.

During the years that Joseph, Florian, and Jerome received bonus payments they devoted long hours and much effort—except Florian during his last illness—to the affairs of the corporation. The growth and success of the business attest to the quality of the services rendered.

The trial court, in commenting in its findings on the services of Joseph, stated:

"That during all the fiscal years of the corporation * * * Joseph L. Henk actually rendered personal services to said corporation by devoting all his time and attention to the business and affairs of said corporation in an executive capacity, and that his work and efforts were largely responsible for the success and growth of said business."

In answer to an interrogatory, the jury found that there was no fraud with intent to willfully evade taxes. On the evidence, no other finding could be sustained. The figures set out in the income tax returns for the several years involved are correct. The government does not dispute them. Its only complaint is that the amounts listed as bonuses were in fact a distribution of profits. In every income tax return that was filed, the amounts received as bonuses were clearly designated as bonuses. The income tax return for the year ending April 30, 1944, was filled out at the local office of the Bureau of Internal Revenue. Joseph took the profit-and-loss sheet and the balance sheet to the gov-

ernment office. These papers reflected correctly the business operations of the corporation during the year. Joseph told his contacts in the office that the year just ended was the first in which the corporation had made a substantial profit and was the first year in which a bonus had been taken. He asked for advice and assistance in connection with the preparation of the income tax return. The financial statements submitted clearly specified that $18,000 had been paid in bonuses to Joseph and Florian, $9,000 each. The papers were checked; Joseph was asked some questions, among them concerning the bonuses, the officers of the corporation, the method of doing business, and the name of the bookkeeper. He was notified when the return was ready and went down to the office. He there signed the return and delivered a check for the amount due. The returns for the years 1946 and 1947 were prepared in the revenue office in substantially the same manner. The records of the company submitted to the office plainly set out the amounts paid as bonuses and designated as bonuses and the drawings, and the bonus and drawings figures inserted in the returns in the internal revenue office came from those records. The figures have not been challenged.

When the corporation first started out it had 8 employees, including officers. At the time of the trial it had 15 employees, the greatest number it ever had. As to the monetary value of the services of Joseph, Florian, and Jerome, there was testimony to the effect that it was worth more than the amount of their combined drawings and bonuses. No testimony was offered by the government as to the value of these services.

The court found that, as compensation to the Henks for their services to the corporation, there was paid to them the amounts of the drawings—properly designated as "drawings" in the findings—and that these drawings constituted the full compensation that the corporation agreed to pay them. Joseph testified that the drawings were not intended as full compensation for the services of the officers and that their real compensation was to come from the splitting of the earnings in the form of a bonus. It must be plain, in view of the services performed by the officers and the volume of business, that the small weekly drawings were not and could not have been intended as full

compensation but simply drawings on account, as the designation itself clearly indicates. The record is conclusive that the drawings actually did not represent the reasonable value of the services rendered by the Henks to the corporation and were therefore not full compensation.

Two of the special interrogatories submitted to the jury were as follows:

"1. Were the bonuses intended as compensation for services to the corporation rather than as distribution of profits?"

"2. Was there fraud with intent to wilfully evade taxes in any years?"

The jury answered both questions in the negative. Taxpayer contends that the wording of the first question is misleading and confusing, since any bonus necessarily must come from the profits of the corporation. There is considerable merit in the contention. Even if we assume that the jury was not confused and that in its answer to question No. 1 it meant to say that the bonuses were not intended as compensation but as distribution of profits, such assumption is of little consequence as we view the situation here.

■ 26 USCA, § 23(a)(1)(A), provides:

"In computing net income there shall be allowed as deductions:

\*   \*   \*   \*   \*

"All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, *including a reasonable allowance for salaries or other compensation for personal services actually rendered*; \* \* \*." (Italics supplied.)

Internal Revenue Service Regulation, 26 CFR (Rev. 1953) 39.23 (a)-6, provides:

"There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services."

The statute and the regulations are plain. Although no citations seem necessary, we would refer to Commercial Iron Works v. Commr. of Int. Rev. (5 Cir.) 166 F. (2d) 221; Heil Beauty Supplies, Inc. v. Commr. of Int. Rev. (8 Cir.) 199 F. (2d) 193; Baltimore Dairy Lunch, Inc. v. United States (8 Cir.) 231 F. (2d) 870.

In Heil Beauty Supplies, Inc. v. Commr. of Int. Rev. (8 Cir.) 199 F. (2d) 193, 196, the court said:

"* * * Services actually rendered, which are ordinary and necessary in the conduct of a business, and for which compensation has been paid, are of course properly a subject for deduction or credit, under section 23(a)(1)(A) of the Internal Revenue Code, to the extent of their reasonable value, having due regard for such margin of prudent judgment as may within natural managerial prerogative be legitimately exercised. And deduction or credit on such a basis should be allowed, if the evidentiary situation is appropriate for the purpose, even though the corporation, in the payments which it has made, has gone beyond these bounds and has been guilty, in part at least, of attempting to distribute profits as purported compensation."

Under the statute above quoted and the Internal Revenue Service Regulations, the corporation was entitled in its income tax returns to deduct, as a necessary business expense in computing its net income, a reasonable allowance for salaries or other compensation for personal services actually rendered by the Henks. Under the findings of the court, all that the corporation was permitted to deduct was the small amount of weekly drawings received by the officers, which could not possibly represent the reasonable value of the services rendered and therefore was not full compensation.

As a result of the court's disallowance of deductions to the extent of the reasonable value of the services rendered by the Henks to the corporation, it was compelled to find that the taxpayer, as of August 13, 1951, was indebted to the government in the sum of $134,868.12. Warrants of distraint were served on the corporation, and all of its property was levied upon and seized. This action necessarily would have resulted in the closing of the taxpayer's business. However, con-

tinuance in business was permitted upon the furnishing of a bond in the sum of $162,000, being 120 percent of the amount found due. The bond was conditioned on the payment of $1,000 per month on the indebtedness of $134,868.12 until September 1952, when the full amount remaining unpaid would become due. The taxpayer has paid $56,000 to the government under this arrangement.

Since the taxpayer was not allowed deductions from its gross income for reasonable allowances for salaries or other compensation of its officers for personal services actually rendered by them, as it was entitled to under the applicable statute above quoted and the Internal Revenue Service Regulations, a new trial is granted the taxpayer in its appeal. It may be that the court, on a retrial, may find that the bonuses paid are reasonable allowances for services rendered. Internal Revenue Service Regulation, 26 CFR (Rev. 1953) 39.23 (a)-6(b)(2, 3), provides that bonuses to employees will constitute allowable deductions from gross income when such payments are made in good faith and as additional compensation for the services actually rendered, provided such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered. In any case, the taxpayer is entitled to reasonable allowances for compensation of Joseph, Florian, and Jerome Henk. For the year 1951 the government allowed Joseph a salary of $10,000 plus a small bonus.

■ The United States also appeals from the judgment. It contends that the court was in error in holding that the statute of limitations had run against its claim to recover excess profits taxes for the fiscal years 1944 to 1946, inclusive. Under our ruling, there may be little or no income upon which an excess profits tax may be levied.

26 USCA, § 710(a)(1), imposes a tax upon the "adjusted excess-profits net income" of every corporation at specified rates. Section 710(b)(1), as amended by 58 Stat. 53, 54, provides for a specific exemption of $10,000 applicable to years beginning after December 31, 1943. Prior to that time the exemption was $5,000. Under the provisions of § 729(a) excess profits tax returns are to be filed and the taxes paid at the same time and place as is the case of the ordinary income tax. Furthermore, Treasury Regulations, Bureau of Internal

Revenue, § 35.729-1(b), directs that the excess profits tax return shall be filed on Form 1121 and that such return shall contain all the information required by such form and by the regulations with respect to the computation of such tax. 26 USCA, § 276(a), provides that, in case of failure to file a return, the tax may be assessed at any time.

The government claims that, since the taxpayer corporation failed to file separate excess profits tax returns for the years 1944 to 1946, inclusive, it is a case of no return at all and the commissioner was not barred from assessing and collecting such taxes, since such taxes may be assessed at any time, not being barred by any statute of limitations. The taxpayer corporation filed its normal returns on Form 1120 for the fiscal years 1944 to 1946, inclusive, but it did not file excess profits tax returns on Form 1121. The taxpayer contends that the normal income tax returns filed for those years, giving full and true information and showing small profit, were sufficient, not requiring the filing of excess profits tax returns; that the filing of these returns started the running of the 3-year period of limitation set forth in § 275; and that, since the excess profits taxes here were not assessed until 1951, the assessment and collection thereof were barred and the court was not in error in so holding.

In Beam v. Hamilton (6 Cir.) 289 F. 9, the first excess profits tax, the one of 1917, was involved. The taxpayer had filed an income tax return for 1917, which on its face failed to show any income subject to excess profits tax. The question presented was whether a penalty ought to be applied for failure to file an excess profits tax return in a year where an income tax return had been filed. The court said (289 F. 14):

"* * * Not only was the excess profits tax a separate, distinct, and then novel source of revenue, but the statute and regulations, as we have above shown, in express and formal terms required separate and distinct returns thereof, and we think it clear that failure to make a separate return of excess profits tax is none the less a failure to make the return contemplated by the statute because of the mere fact that the computations on the excess profits return are to be carried onto Form 1040; the use of that form also is necessary to a complete report."

Thus, the court held that the normal income tax and the excess profits tax are two separate taxes and require the filing of separate income tax returns. Applied here, the filing of the normal income tax return would not be sufficient under the Beam case. Failure to file an excess profits tax return would result in a case of "no return," and the tax may be assessed at any time.

In Rockland & Rockport Lime Corp. v. Ham (D. Me.) 38 F. (2d) 239, the taxpayer had given data concerning the sale of certain vessels in a supplementary note or rider, but the data was not sufficiently complete to enable the commissioner to assess an excess profits tax. The original return to which the note was attached was made on Form 1031, whereas the commissioner required that the return of excess profits taxes be on Form 1103. The court held that, even if the note attached to the income tax return of 1918 had been more in detail, it was not the tax return required by law. Since there was a failure to file a required return, suit to collect could be begun at any time.

In McDonnell v. United States, 75 Ct. Cl. 175, 59 F. (2d) 295, it was held that the balance sheet which the taxpayer partnership attached to its normal income tax return on Form 1065 was not a sufficient compliance with the statute and regulations requiring the filing of an excess profits tax return. There is a similar holding in Atterbury v. United States, 75 Ct. Cl. 191, 59 F. (2d) 300.

By a divided court, two to one, it was held in United States v. Tillinghast (1 Cir.) 69 F. (2d) 718, that where income tax return showed no profits, failure to file supplementary return under excess profits tax was not "failure to file required return." It held that the failure was due to honest mistake and did not involve penalties imposed for not making any return. In an opinion which concurred in the result on the ground that the government had not shown that there was any excess profits tax due, but disagreed with the majority in its holding as to the failure to file an excess profits tax return, it is stated (69 F. [2d] 722):

"* * * In face of all the decisions by the courts, however, in which they have held that a return for excess profits tax was not a part of

the return for a normal tax but supplementary thereto, and have held that it was a separate return, and since the Supreme Court has denied certiorari in several such cases, I do not think I can agree that the statute of limitations as to excess profits taxes began to run in this case at the time of the filing of the return No. 1031 [the normal income tax return]. McDonnell v. United States (Ct. Cl.) 59 F. (2d) 295; Atterbury v. United States (Ct. Cl.) 59 F. (2d) 300.

"Beam v. Hamilton (C. C. A.) 289 F. 9; United States v. Updike (D. C.) 1 F. (2d) 550. * * * affirmed by the Circuit Court of Appeals for the Eighth Circuit in 8 F. (2d) 913; * * *."

In Commr. of Int. Rev. v. National Land & Const. Co. (6 Cir.) 70 F. (2d) 349, the taxpayer, on March 30, 1918, filed a tax return for the year 1917 on Form 1031 (normal tax return) showing total net income of $90.99 and an income tax of $1.82. It did not file a return on Form 1103 (excess profits tax return) but stated on Form 1031 that there was no excess profits tax due. The court refused to follow United States v. Tillinghast, *supra,* and held that there was no return. It did follow Beam v. Hamilton, *supra.* See, also, Updike v. United States (8 Cir.) 8 F. (2d) 913; John D. Alkire Inv. Co. v. Nicholas (10 Cir.) 114 F. (2d) 607.

The government relies principally on Commr. of Int. Rev. v. Lane-Wells Co. 321 U. S. 219, 64 S. Ct. 511, 88 L. ed. 684. In that case it was held that where a personal holding company, for the years 1934, 1935, and 1936, failed to make and file a separate return on Form 1120H, as required by applicable and valid treasury regulations, in respect of the surtax imposed on personal holding companies by Title IA of the Revenue Acts of 1934 and 1936, the assessment of the tax could be made at any time, notwithstanding that the corporation made and filed a return for each year on Form 1120 in respect of the ordinary income tax imposed by Title I of the acts. The filing of the ordinary income tax returns, in which the corporation erroneously denied that it was a personal holding company, did not start the statute of limitations running against assessment of the surtax. The court said (321 U. S. 222, 64 S. Ct. 513, 88 L. ed. 686):

"The taxpayer has not complied with this regulation. It says, however, that its regular corporation income tax return must be taken as an equivalent to the separate return, under our decision in Germantown Trust Co. v. Commissioner, 309 U. S. 304, both for starting the period of limitation and for avoiding the penalty. The taxpayer in the Germantown case filed a return on a wrong form. The return contained, however, 'all of the data from which a tax could be computed and assessed although it did not purport to state any amount due as tax,' and the Court said, 'this defect falls short of rendering it no return whatever.' 309 U. S. at 308, 310. There the only liability involved was for a Title I income tax, and the return was addressed to that liability, as to which the court held that it set the statute of limitations running. Here the taxpayer is under liabilities for two taxes and under an obligation to file two returns, and it says that one return addressed to but one of the liabilities answers the purpose of both.

"* * * Taxpayer says that the information called for by Form 1120H is information that could have been called for by Form 1120. We assume so, but we do not see how the fact helps the taxpayer, for the Treasury was fully within the statute in requiring that information in a separate return."

The corporation taxpayer relies upon Germantown Trust Co. v. Commr. of Int. Rev. 309 U. S. 304, 60 S. Ct. 566, 84 L. ed. 770, claiming that its normal income tax returns were free from fraud and that all the data was given in its normal tax returns from which an excess profits tax could be computed and that therefore no excess profits tax return was necessary. As pointed out in Commr. of Int. Rev. v. Lane-Wells Co. *supra,* only one tax was involved in the Germantown case, while here, as in the Lane-Wells case, two taxes are involved, requiring the filing of two separate returns.

The cases cited so far are cases arising in the Federal courts. Several state courts have passed on the same question. In Matter of Hewitt v. Bates, 297 N. Y. 239, 78 N. E. (2d) 593, 3 A. L. R. (2d) 642, it was held that the filing of the individual income tax returns, without intention to comply with the requirement of filing of the unincorporated business tax return, was not sufficient to start the running of the statute

of limitations for that tax, even though the return filed gave practically identical information with that required in the business tax return. It was a case of no return at all, following Commr. of Int. Rev. v. Lane-Wells Co. *supra*.

In People v. Universal Film Exchanges, Inc. 34 Cal. (2d) 649, 656, 213 P. (2d) 697, 702, the court said:

"'* * * There is a difference between a defective or incomplete return filed in good faith in an attempted compliance with the law and the filing of what in effect is 'no return' at all for the purpose here in question. As illustrative of the latter situation, a return * * * which purports to answer two tax liabilities without the filing of the additional separate return required by the governing statute and regulations * * * will not suffice to start the period of limitations running against an additional tax assessment," citing Commr. of Int. Rev. v. Lane-Wells Co. 321 U. S. 219, 64 S. Ct. 511, 88 L. ed. 684, and others.

In Whitmore Oxygen Co. v. State Tax Comm. 114 Utah 1, 11, 196 P. (2d) 976, 982, it is stated:

"'* * * The fact that the Tax Commission has made it possible to file both a use and a sales tax return on the same form does not mean that a filing of one shall constitute a filing of both," following Commr. of Int. Rev. v. Lane-Wells Co. *supra*.

In 30 Am. Jur., Internal Revenue, § 300, p. 332, the rule is clearly stated thus:

"'* * * where a taxpayer is under liabilities for two taxes and an obligation to file two returns it cannot be said that one return addressed to but one of the liabilities answers the purpose of both."

In view of the above authorities, we are of the opinion that the court was in error in holding that the statute of limitations had run against an excess profits tax when no return for such tax had been filed. It is a case of "no return," and action to recover such tax may be brought at any time.

Judgment reversed and new trial granted.